IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JOSEPH PATRICK CLEMENS,

                       Plaintiff,                      OPINION AND ORDER

    v.

                                              16-cv-467-wmc

MARK T. ESPER,
Secretary of the Army,

                       Defendant.

Plaintiff Joseph Patrick Clemens alleges that the Army discriminated against him based on his disability and retaliated against him in violation of the Rehabilitation Act, 29 U.S.C. § 791, *et seq.*[1]  As Clemens does not oppose defendant's motion for summary judgment on his retaliation claim (*see* Pl.'s Opp'n (dkt. #64) 1), the court will focus on the disputed discrimination claim.  Because Clemens failed to create an issue of fact as to whether he could perform the essential functions of his job as the supervisory public safety dispatcher -- with or without accommodations -- defendant's motion is granted.

UNDISPUTED FACTS[2]

**A. Background**

Fort McCoy is an Army military installation and training center in central

---

[1] As the court noted previously, "the only proper defendant for claims of discrimination under the Rehabilitation Act is the head of the agency accused of having discriminated against the [plaintiff]." (MTD Op. (dkt. #42) 2 (citing *Hamm v. Runyon*, 51 F.3d 721, 722 n.1 (7th Cir. 1995)).) Accordingly, neither former Secretary Murphy nor the Department of the Army is an appropriate defendant.  Additionally, while plaintiff brought suit purportedly under the Americans with Disabilities Act, his claims arise under the Rehabilitation Act.  (*Id.* at 5 & n.3.)

[2] Viewing the facts in the light most favorable to plaintiff as the non-moving party, the following

Wisconsin. The installation covers some 60,000 acres and has a population that varies between 4,000 and 20,000. It is used to prepare Army Reserve and National Guard troops for operations. At Fort McCoy, the Directorate of Emergency Services ("DES") bears responsibility for security, safety, health and life at Fort McCoy. DES is made up of security, emergency services, law enforcement, and the Enhanced 911 Emergency Communications Center. Since May 2007, Mark Fritsche has been the director of DES.

Plaintiff Joseph Clemens first worked for the federal government from 1993 to 2004 and then again from 2006 until his termination on December 31, 2011. While employed, Clemens attended multiple trainings and received numerous certifications as a first responder and firefighter.

### B. Supervisory Public Safety Dispatcher

In December 2008, Clemens was hired to serve as the supervisory public safety dispatcher for Fort McCoy. This full-time position was created to establish an emergency communications center and then to serve as an emergency dispatch expert. The supervisory public safety dispatcher was also a DES branch chief, reporting directly to Fort McCoy's chief of police. From December 2009 through July 2016, Robert Stapel held that position.

Working in Fort McCoy's Public Safety Center, the supervisory public safety dispatcher had a myriad of responsibilities relating to resources and staffing, including buying, installing, and requesting upgrades for necessary dispatch equipment, as well as

_____

facts are material and undisputed for purposes of summary judgment except where noted below.

hiring, training, supervising, evaluating, and scheduling staff. In that position, Clemens oversaw four to six staffers and was responsible for hiring others. Accordingly, he provided new-employee orientation and conducted performance evaluations, ensuring that all dispatchers were adequately trained to respond to and address calls; he created and updated policies and procedures and training manuals; and he assigned staff duties to ensure coverage 24/7. Additionally, Clemens was responsible for preparing the 911 dispatch center's annual budget and communicating with others in the DES. The parties agree that in order to do his job, Clemens had to either be at the installation or nearby. (*See* Clemens Dep. (dkt. #56) 128:21-24; Stapel Decl. (dkt. #52) ¶ 6.) They also agree that the position of supervisory public safety dispatcher was essential to DES's mission, but acknowledge that that the position was not posted until September 17, 2012, following Clemens's removal.

On the other hand, the parties disagree about what job functions were essential. First, they disagree whether it is essential that the supervisory public safety dispatcher needed to serve as an emergency dispatcher, with plaintiff describing his job as "primarily an administrative position" and averring that he "was never required to handle a 911 call." (Clemens Decl. (dkt. #58) ¶ 47; *but see* Position Description (dkt. #56-1) 2 ("Incumbent may be required to perform Public Safety Dispatcher duties, provides emergency police, fire and medical services to the public by answering emergency 911 calls and responding with appropriate personnel and equipment.").) Second, while the parties agree that Clemens met with DES leadership and other Fort McCoy directorates, as well as vendors for equipment installation, they disagree whether meeting with external entities was an

essential function. (*Compare* Clemens Decl. (dkt. #58) ¶ 44 ("Attending meetings with other federal and local agencies, such as other law enforcement agencies, . . . was not an essential function of the dispatch supervisor position. In my two plus years in this position I attended only two or three off-site meetings . . . ."), *with* Fritsche Decl. (dkt. #53) ¶ 7 (identifying the supervisory public safety dispatcher's "essential functions" to include "attending meetings with . . . other agencies such as law enforcement agencies in surrounding communities and their dispatch centers for coordination of mutual assistance related to emergency services").) Third, they disagree whether serving as a subject-matter expert for radio/communications systems and public safety, as well as testing and troubleshooting communications equipment throughout the installation, were essential functions. (Clemens Decl. (dkt. #58) ¶¶ 45-46; Stapel Decl. (dkt. #52) ¶¶ 4-5.)[3] Fourth, the parties disagree generally on the relative importance of oral communication by the supervisory public safety dispatcher with the staff and emergency personnel, and more specifically, whether the essential job functions include effective oral communication. (*See* Clemens Decl. (dkt. #58) ¶ 43 ("I typically used written material for staff training."); Clemens Dep. (dkt. #56) 25:2-12 (explaining that he provided classroom training for police, firefighters and dispatchers when new equipment was acquired); *id.* 41:13-19 (testifying that he orally communicated with staff about the status of operations).)

---

[3] The parties do, however, seem to agree that the Network Enterprise Center ("NEC") handled information management and radio communication, including troubleshooting and testing the equipment. (*See* Def.'s Resp. to Pl.'s PFOF (dkt. #67) ¶ 106.)

## C. Clemens's Medical Condition

Clemens had his first stroke (also referred to in this record as a "cardiovascular accident" or "CVA") on March 11, 2011.[4] Clemens was initially hospitalized for six days at Advocate Lutheran General Hospital in Illinois until March 17, 2011, and continued to have right-side weakness and numbness, as well as difficulty forming words and speaking, when discharged. He then attended physical, occupational, and speech therapy three times a week.

Unfortunately, Clemens suffered a second stroke some two months later, on May 11, 2011, which necessitated an additional hospital stay at Advocate Lutheran General Hospital, this time from May 11 through May 16. This second stroke was more significant and caused greater neurological deficits, which included worsening the symptoms that remained from his first stroke. Following his second discharge, Clemens, therefore, also received counseling, while continuing to receive physical, occupational and speech therapy.

With treatment, Clemens rapidly improved for a few weeks, but then plateaued and even suffered subsequent occurrences of worsening speech and physical weakness. His continuing aphasia included trouble speaking, reading, writing, and comprehending. In particular, Clemens has difficulty expressing himself and being heard; he also suffers from dysarthria (difficulty with articulation) and dysphonia (difficulty speaking due to a

---

[4] At the time, he had not finished setting up the 911 center and was working on a trunk radio project converting multiple radio systems into one transmission. (*See* Clemens Dep. (dkt. #56) 27:7-10, 53:12-54:23.)

physical disorder).[5]  Although the parties dispute how often, the aphasia further forces Clemens to have to re-read material, because he tends to read it incorrectly initially.[6] Moreover, the aphasia impacts his ability to write down his thoughts, and requires others to speak more slowly so he can understand, particularly when there are multiple people speaking at once, which causes Clemens difficulty processing information.   Finally, Clemens has attempted to control his blood pressure by reducing stress.

On November 26, 2011, Clemens completed an adult function report for his social security disability application.  When asked to describe his condition, he wrote:

> Ineffective communication caused by the aphasia, limited mobility, can only walk/stand for limited amount of time, lack of stamina caused by doing anything, including, but not limited to talking, walking, writing or using any motor function

---

[5]      *See      Dysarthria*,      American      Speech-Language-Hearing      Association, https://www.asha.org/public/speech/disorders/dysarthria/ (last visited June 14, 2018); *The Use of Voice Therapy in the Treatment of Dysphonia*, American Speech-Language-Hearing Association, https://www.asha.org/policy/TR2005-00158/ (last visited June 14, 2018).

[6] While plaintiff purports to dispute defendant's proposed finding of fact regarding this limitation, Clemen's own testimony appears to establish just that.  Specifically, defendant's factual finding proposed that:  "Clemens' aphasia affects his ability to read because he reads things wrong and has to read something repeatedly."  Plaintiff responds "Dispute. Aphasia rarely affects Clemens reading. He does not have difficulty reading."   In his declaration, Clemens further stated "Aphasia rarely affects my reading. I do not have difficulty reading."  (Clemens Decl. (dkt. #58) ¶ 34.)  In reply, defendant quotes Clemens's deposition testimony:
>     Q: Does your aphasia affect reading for you?
>     A: Yes, yes, yes, yes.
>     Q: In what way?
>     A: I, I, I read it, read it wrong, wrong, so I have to read a lot, a lot.
>     Q: You have to read it over and over again?
>     A: Yes, yes, yes, yes.

(Clemens Dep. (dkt. #56) 55:14-21.)  Even discounting for Clemens' oral communication deficits, it is hard to reconcile such apparently contradicting testimony with his later, self-serving affidavit. *See Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168 (7th Cir. 1996) ("[P]arties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions").

> which causes extreme fatigue, disturbed sleep pattern caused
> by the constant fatigue, right side is weak, diminished
> sensation, ataxia affecting all extremities causing tremors.

(*See* Clemens Dep. (dkt. #56) 138:19-140:1.)  Accordingly, at that time he was very limited by fatigue, as well as by limitations in stamina and physical capabilities.  As a result, he was productive for about two or three hours a day and rested the remainder.  He also required rest periods after each activity.  His attention span was further limited to approximately half an hour, or until he was interrupted, and he had trouble maintaining his train of thought, which included actual confusion if multiple people spoke at once.  In addition, due to the risks of suffering another stroke or falling and injuring himself, Clemens did not generally leave the house alone.  Likewise, he did not drive because he could not control his movements; he relied on others to drive him places; and, therefore, he did not go out often.  Finally, while the parties dispute the extent of Clemens's ability to communicate with others over the phone and in person, there is no dispute that he also removed himself from stressful situations.  (Def.'s Reply to Pl.'s Resp. to Def.'s PFOF (dkt. #66) ¶ 142.)

From the time of his first stroke through the end of 2011, Clemens never returned to work at Fort McCoy.  The parties dispute the reason why:  plaintiff blames defendant's refusal to accommodate his disability or even to discuss the possibility of reassignment; and defendant contends that plaintiff spent his time in recovery, unable to perform his essential job functions or even travel to work.  (*See* Def.'s Reply to Pl.'s Resp. to Def.'s PFOF (dkt. #66) ¶ 70.)  The parties do, however, agree that during this time, Clemens was rehabbing and receiving treatment in Illinois.  They also agree that Clemens still resides in

Des Plaines, Illinois, which is approximately 200 miles from Fort McCoy, and that Clemens could not drive from the time of his first stroke through at least the end of 2011. Likewise, the parties agree that Clemens has not been cleared by his physician to return to work, nor did he inform anyone at Fort McCoy that he could return. In his absence, his duties were performed by other dispatchers.

### D. Correspondence Following Clemens's Strokes

Clemens does not recall if he emailed his direct supervisor, Police Chief Stapel, after his first stroke. Clemens did email Stapel on May 19, 2011, informing him of Clemens's re-hospitalization after the second stroke. Clemens also updated Stapel about his condition at that time: doctors were less optimistic about the possibility of a full recovery; his right side and speech were greatly impacted; he could not drive; he had muscle and sensory deficits on the right side; his speech had worsened; and he was scheduled for multiple rehab and doctor's appointments. (May 19 Email (dkt. #58-7) 1.) Clemens requested advanced leave and leave donation (*id.*), and he also submitted a form requesting leave or approved absence. On the form, he explained that he "[s]uffered CVA 3-11-11, in rehab, during rehab, 5-11-11, had reaction and was readmitted to hosp. Request Leave Donation, unknown return date." (Leave Request Form (dkt. #58-8) 1.) He also requested accrued annual and sick leave, advanced annual and sick leave, leave without pay, Family and Medical Leave Act ("FMLA") leave, and leave donation. (*Id.*)

Attached to the May 19 email, Clemens provided an FMLA health care provider certification completed by Dr. Andrey Lev-Weissberg on March 14, 2011. (*See* FMLA Certification (dkt. #58-7) 3-6.) Lev-Weissberg opined that: (1) Clemens's condition

would be of "unknown" duration, but Clemens would be incapacitated for one month after his first stroke; (2) Clemens would be unable to perform job functions of "quick effective radio communication[ and] fine motor tasks"; (3) Clemens suffered from "significant loss of speech ability with considerable dysphonia"; (4) Clemens had been referred to occupational, physical and speech therapies, as well as to a neurologist for stroke evaluation and rehab; and (5) Clemens would need a reduced work schedule to accommodate appointments "2-3 x/week for several months," such that Clemens could only work five hours a day, two or three times a week through May 1, 2011.  (*Id.* at 3-4.)[7]

On May 20, 2011, Stapel first requested medical documentation.  He then sent Clemens a letter and questionnaire seeking that same documentation on June 13.[8]  Stapel requested the medical documentation to assist with "determining [Clemens's] current and future employment status." (June 13 Letter (dkt. #58-11) 1.)[9]  Stapel approved Clemens's request for advanced leave on June 17.  On June 21, Clemens sought additional time to get the medical documentation, explaining that his numerous treatment providers needed to be consulted to answer all the questions completely.   In this email, Clemens again acknowledged that he could not drive.

---

[7] In response to plaintiff's additional proposed findings of fact, defendant states that "Lev-Weissberg indicated Clemens could work five days a week, 2-3 hours per day from March 11, 2011-May11[sic], 2011," (*see* Def.'s Resp. to Pl.'s PFOF (dkt. #67) ¶ 16), however this is contradicted by the FMLA certification completed by Lev-Weissberg and defendant's proposed findings of fact, which include the correct reading (*see* Def.'s Reply to Pl.'s Resp. to Def.'s PFOF (dkt. #66) ¶ 91).

[8] This same letter was also emailed to Clemens on June 17, 2011.

[9] While defendant initially contended that the request was to facilitate the paperwork for leave donation and advanced sick leave (*see* Def.'s Reply to Pl.'s Resp. to Def.'s PFOF (dkt. #66) ¶ 94), he acknowledges that the documentation was sought to assist Stapel in determining plaintiff's future and current employment status (*see* Def.'s Resp. to Pl.'s PFOF (dkt. #67) ¶ 28).

On June 30, Clemens next emailed Stapel a June 21st medical evaluation from Dr. Lev-Weissberg and a worker's compensation claim. Clemens noted that he was waiting on information from his neurologist, Dr. Timothy Mikesell. Dr. Lev-Weissberg opined that: (1) Clemens was "at risk for future events" and would "likely make a partial recovery"; (2) Clemens "has difficulty" with activities and duties;[10] (3) "[p]erhaps text to voice" would be an accommodation allowing Clemens to perform the essential functions of his job, noting that "[h]is speech is affected so I do not know what other devices are available to help"; and (4) "[t]yping and other secretarial work is ok." (June 21 Eval. (dkt. #56-6) 1-2.) Lev-Weissberg believed that verbal communication was important to Clemens's work. Stapel acknowledged receipt of the evaluation on July 1, telling Clemens "I will be in touch with MER and DHR to ensure they receive the necessary paperwork and if anything further is required you are advised." (July 1 Email (dkt. #58-12) 1.) Stapel did not communicate with Clemens again until October.

Clemens further sought leave under the Army's Voluntary Leave Transfer Program on July 22. On his application form, he indicated that his stroke-induced medical emergency would end on an "Unknown" date. The next day, Clemens emailed Stapel, informing him that he was continuing his treatment, had follow-up appointments the next month, was moving slowly, and was still unable to drive. With that email, Clemens also provided a medical evaluation by his neurologist, Dr. Mikesell. Mikesell opined that:

---

[10] At his deposition, Lev-Weissberg clarified that he was "certain that [Clemens] would have significant difficulty with fine motor skills, speaking into the radio, possibly also comprehending certain commands, but without a doubt expressively significant difficulty. He had, at that time, some difficulty walking." (Lev-Weissberg Dep. (dkt. #55) 29:19-30:5.)

(1) "[t]ime will tell his prognosis; it is unknown now"; (2) Clemens's "limitation seems to be speech," which is his "difficulty"; and (3) Clemens could reasonably perform "[a] position without significant talking." (June 24 Eval. (dkt. #56-9) 1-2.) Despite repeated protests that he could have returned to work with accommodations at this time (*see e.g.*, Pl.'s Resp. to Def.'s PFOF (dkt. #62) ¶ 133), Clemens acknowledged in his deposition that he needed additional time to recover from his stroke, which is why he was requesting participation in the leave transfer program (Clemens Dep. (dkt. #56) 105:8-106:2, 109:5-13). Clemens's application for the leave donation program was approved by Stapel on July 28, 2011.

On August 1, 2011, Clemens informed Sherrie Waldera, who appears to have been involved in Clemens's workman's compensation claim for the agency, that: he was living in Illinois and most of his medical appointments were in the Chicago area; he had not received a return to work date from his treatment providers; and he was still unable to drive, so communicating via phone or email was preferred. (Aug. 1 Email (dkt. #56-10) 2.) Clemens also asked Waldera who he should contact regarding disability retirement "just in case." (*Id.*)

On August 21, when Clemens submitted his disability retirement application to the Army, he had exhausted his paid leave and was on leave without pay. On his application, he indicated that his "Stroke / Cardiovascular Accident CVA" interfered with "[c]ommunication, speech, mobility, walking, memory, right side Hemiparesis, ataxia, [and] aphasia," adding that he is "[u]nable to operate a motor vehicle." (Disability Ret. Application (dkt. #56-11) 1.) Clemens noted that his agency had been unable to provide

11

his requested accommodation of "[a]ssistance with communication." (*Id.*) He also completed the Social Security Online Benefits Application, which was required by both the Office of Personnel Management and the Federal Employee Retirement System. Despite protests that he could have returned to work with appropriate accommodations (*see e.g.*, Pl.'s Resp. to Def.'s PFOF (dkt. #62) ¶¶ 134-35), Clemens acknowledged at his deposition that he informed the Social Security Administration that he could not work as of August 25, 2011 (Clemens Dep. (dkt. #56) 157:20-158:17; *see also id.* 158:18-21 (acknowledging representation to the army in his disability retirement application that he could not work)).

## E. Possible Accommodations

Clemens alleges that he spoke with Stapel on the phone in May 2011 and told him that he required additional leave and assistance with speech in order to come back to work. In contrast, defendant contends that there were no telephone conversations between Clemens and Stapel. (*See* Def.'s Resp. to Pl.'s PFOF (dkt. #67) ¶ 22.) As noted previously, Dr. Lev-Weissberg identified "[p]erhaps text to voice" or a secretarial position as possible accommodations.[11] Dr. Mikesell, on the other hand, did not suggest an accommodation permitting Clemens to return to work, but rather suggested his transfer to a position that did not require significant talking.

After Clemens submitted these evaluations, he did not mention "text to voice" or the possibility of a different position to Stapel or Fritsche. He did, however, indicate that

---

[11] The parties agree that Army policy allowed a request for accommodation to originate with an employee's doctor, such that Dr. Lev-Weissberg's suggestion of "[p]erhaps text-to-voice" was a request for accommodation for Clemens.

his return date was unknown, request more leave, and file for disability retirement.  No one at Fort McCoy followed up with Lev-Weissberg about his proposed accommodations, nor did anyone indicate that they had any questions about the text-to-voice accommodation.  Likewise, between July 1 and October 31, 2011, no one at Fort McCoy indicated that a determination had been made about Clemens's accommodation request, nor did anyone at Fort McCoy raise the possibility of reassignment, including whether Clemens was willing to be reassigned to a different position, a position at a lower pay grade or a position outside Fort McCoy.

### F.  Termination

Clemens never informed Stapel of a return to work date, and neither Stapel nor DES director Fritsche ever asked Clemens to identify one.  Based on his communications with Clemens, Stapel understood that Clemens "was unable to return to work due to his medical treatments, rehabilitation efforts, and inability to drive."  (Stapel Decl. (dkt. #52) ¶ 9.)  Clemens disputes this, however, arguing that Stapel never discussed with him or his doctors whether he could perform his essential job functions with a reasonable accommodation or whether there was a vacant position to which he could be reassigned that did not require significant talking.  (*See* Clemens Decl. (dkt. #58) ¶¶ 28-30.)

Based in part on advice from Management and Employee Relations and Army legal counsel, Stapel sent Clemens a notice of proposed removal on October 31, 2011.  Stapel's letter stated, "Your current Functional Capacity Examination provides that you are unable to perform the functional requirements essential to the duties of your position."  (Oct. 31 Letter (dkt. #58-16) 1.)  Clemens contends that he never underwent such an examination.

The notice also provided Clemens an opportunity to explain why he should not be removed. On November 10, Clemens sought, and later received, an extension of time to respond from Fritsche, the DES director.[12]

Clemens provided his written response on November 26, 2011, but did not provide additional information from his doctors. Instead, Clemens argued that "Mr. Stapel is not authorized to propose, recommend nor threaten any type of adverse action." (Nov. 26 Letter (dkt. #56-13) 1.) He also noted that he had "applied for immediate disability retirement" and was "awaiting a separation date." (*Id.*) Still, Clemens did not indicate that he could perform the essential functions of his job, nor that he could return to work. (*See id.*)

Fritsche decided to terminate Clemens around December 1, 2011. The parties disagree about how he came to that decision. (*See* Def.'s Reply to Pl.'s Resp. to Def.'s PFOF (dkt. #66) ¶¶ 170-71.) On December 1, Fritsche told human resources specialist Mallory Fritz that he supported Clemens's removal and asked her to draft a decision letter for his review the week of December 19. Fritsche issued the decision letter on December 20, with an effective date of December 31, 2011.

Around December 8, Clemens complained to the EEO office alleging that Stapel and Fritsche had discriminated against him by failing to accommodate his disability and attempting to fire him. EEO Officer Carolyn Beck interviewed Stapel, who told her something could have been used to help Clemens speak. While he had found a device that

---

[12] The court gathers that Clemens addressed his request and the response to the notice of proposed removal to Fritsche because "according to [Clemens's] Official Position Description, number DE292071, it clearly specifies [his] Supervisor as [Fritsche]." (Nov. 26 Letter (dkt. #56-13) 1.)

could have been used for the telephone, Stapel contends that he was unaware of a speech aid for communication on both telephone and radio, or any to aid in-person communications. (Stapel Decl. (dkt. #52) ¶ 13.) Following Clemens's removal, the position of supervisory public safety dispatcher remained vacant for another eight or nine months.

### G. Clemens's Current Condition

Following his termination, Clemens has not sought employment elsewhere because of his continued aphasia and communication problems. He still has ongoing problems with communication, mobility, memory, and right-side hemiparesis. His mobility problems impact his walking, such that he requires help if walking more than a block; he has trouble with stairs and sometimes needs to use a wheelchair. He still needs to avoid stress to prevent further complications. Nevertheless, Clemens contends that he can communicate effectively with the assistance of technology. (Clemens Decl. (dkt. #56) ¶¶ 35-37.) However, he admits being unable to work and that he is not employed due to his aphasia and associated communication problems. (Pl.'s Resp. to Def.'s PFOF (dkt. #62) ¶¶ 195, 199.) Finally, Clemens receives social security disability benefits, Army disability benefits, and an Illinois property tax exemption for individuals who are disabled and unable to participate in substantial gainful activity.

Clemens has since identified two software programs used at Fort McCoy that he believes could have helped him had he returned to work: (1) Adobe, which can read typed documents aloud; and (2) Mobile Data Communications ("MDC"), which is a program that he had installed on the dispatch computers before his stroke that allowed the

dispatchers to type messages that would be read aloud to the emergency vehicle drivers. Clemens also now identifies several positions that were open between June 2011 and the end of that year, but the parties dispute both whether those jobs would have required a significant amount of talking and whether he would have been qualified.  (*See* Def.'s Resp. to Pl.'s PFOF (dkt. #67) ¶ 111.)

OPINION

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  At this stage, all reasonable inferences must be drawn in favor of plaintiff as the nonmoving party.  *Ozlowski v. Henderson*, 237 F.3d 837, 839 (7th Cir. 2001) (citing *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).  To avoid summary judgment, plaintiff must marshal enough evidence -- not merely a scintilla -- to permit a jury to rule in his favor.  *Nowak v. St. Rita High School*, 142 F.3d 999, 1002 (7th Cir. 1998) (internal citations omitted).

"'The ADA and Rehabilitation Act prohibit an employer from discriminating against a qualified individual with a disability because of the disability.'"  *Jackson v. City of Chic.*, 414 F.3d 806, 810 (7th Cir. 2005) (quoting *Silk v. City of Chic.*, 194 F.3d 788, 798 (7th Cir. 1999)).  To make a *prima facie* claim under the Rehabilitation Act, a plaintiff must show that:

> "(1) [he] is disabled within the meaning of the statute; (2) that [he] was otherwise qualified for the job in question; (3) that [he] was discharged or the subject of other adverse action solely because of [his] disability; and (4) the employment program of which [his] job was a part received federal financial assistance."

16

*Whitaker v. Wis. Dept. of Health Servs.*, 849 F.3d 681, 684 (7th Cir. 2017) (quoting *Felix v. Wis. Dep't of Transportation*, 828 F.3d 560, 568 (7th Cir. 2016)). Because no reasonable jury could find that plaintiff was "otherwise qualified" for his job as the supervisory public safety dispatcher, defendant is entitled to summary judgment.

## I.  Interactive Process

Plaintiff devotes the bulk of his opposition to detailing how his superiors failed to engage with him in the interactive process required to identify an appropriate accommodation. (*See* Pl.'s Opp'n (dkt. #64) 4-16.) While plaintiff is correct that the interactive process was not used, that failing "is not an independent basis for liability." *See Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 285, 292 (7th Cir. 2015) (quoting *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1059 n.1 (7th Cir. 2014)).

Typically, once an employee has notified his employer about his disability, the employer must engage with him in an interactive process to identify an appropriate accommodation. *Spurling*, 739 F.3d at 1061 (quoting *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005)). In light of the evidence of plaintiff's profound communication issues, a reasonable jury might well find that defendant failed to engage in a meaningful, interactive dialogue with Clemens to identify an appropriate accommodation. However, an employer's failure to do so need not be considered where "the employee fails to present evidence sufficient to reach the jury on the question of whether [he] was able to perform the essential functions of [his] job with an accommodation." *Stern*, 788 F.3d at 292. (quoting *Basden*, 714 F.3d at 1039). Moreover, it is the *employee's* burden to show that he could have performed his essential job functions

with a reasonable accommodation. *Id.* (quoting *Spurling*, 739 F.3d at 1062). As discussed below, plaintiff cannot make this showing.

## II. Qualified Individual

In order to be a "qualified individual," an employee must "satisf[y] the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc."; if he does, he must be able to "perform the essential functions of the position . . . with or without reasonable accommodation" at the time he was fired. *Stern*, 788 F.3d at 285, 287; *see also Whitaker*, 849 F.3d at 684 (explaining that an "otherwise qualified" employee is one who "is capable of performing the 'essential functions' of the job with or without a reasonable accommodation"); *Nowak*, 142 F.3d at 1003 (explaining that the qualified individual determination "must be made as of the time of the employment decision" (internal citation omitted)). As mentioned above, plaintiff must establish that he was a qualified employee. *Nowak*, 142 F.3d 1003.

There is no dispute that Clemens had the requisite background experience and knowledge to serve as Fort McCoy's supervisory public safety dispatcher as he had held the position for about two years before his stroke. The relevant dispute is over plaintiff's claims that he was able to perform the position's essential functions after his stroke, with or without accommodation. Even more fundamentally, the parties disagree about the exact contours of the supervisory public safety dispatcher's responsibilities.

"[T]o determine whether a particular duty is an essential function," the court is to consider factors like "the employee's job description, the employer's opinion, the amount of time spent performing the function, the consequences for not requiring the individual

to perform the duty, and past and current work experiences." *Stern*, 788 F.3d at 285 (quoting *Gratzl v. Office of the Chief Judges of the 12th, 18th, 19th & 22nd Judicial Circuits*, 601 F.3d 674, 679 (7th Cir. 2010)). While the employer's judgment is important, it is not controlling; workplace practices are also considered. *Id.* (quoting *Miller v. Ill. Dep't of Transp.*, 643 F.3d 190, 198 (7th Cir. 2011)). While the parties disagree about the precise contours of the position's essential functions, at a minimum the supervisory public safety dispatcher required presence at (or at least near) Fort McCoy and some oral communication skills. Despite plaintiff's repeated protests to the contrary, the overwhelming evidence is that he could not have returned to work at Fort McCoy even with all appropriate accommodations.

While the qualified individual inquiry is considered at the time that plaintiff was terminated, the undisputed facts also compel a reasonable trier of fact to find that he could not have fulfilled his essential duties, with or without accommodation, at any time following his strokes in 2011. First, "regular attendance is an essential function of many jobs." *Whitaker*, 849 F.3d at 684 (internal citations omitted); *Nowak*, 142 F.3d at 1003 ("Obviously, an employee who does not come to work cannot perform the essential functions of his job."); *Waggoner v. Olin Corp.*, 169 F.3d 481, 483 (7th Cir. 1999) ("It should not require saying that generally attendance is a requirement of a job. Not surprisingly, courts are in agreement on this point." (internal citations omitted)). "[A]ttendance at the job site is a basic requirement of most jobs. . . . 'Except in the unusual case where an employee can effectively perform all work-related duties at home, an employee who does not come to work cannot perform *any* of his job functions, essential or

otherwise.'" *Waggoner*, 169 F.3d at 484 (quoting *Tyndall v. Nat'l Educ. Ctrs.*, 31 F.3d 209, 213 (4th Cir. 1994)).

Second, the undisputed facts indicate plaintiff could not have physically been at work to perform his duties. The parties agree that the job was located at Fort McCoy's Public Safety Center. (Pl.'s Resp. to Def.'s PFOF (dkt. #62) ¶ 15.) While plaintiff testified that he needed to be "either on the installation or nearby" (Clemens Dep. (dkt. #56) 128:21-24), he admits that "[p]roviding in person evaluations of staff was an essential function" of his job (Pl.'s Resp. to Def.'s PFOF (dkt. #62) ¶ 37). He also agreed that installing dispatch operation equipment, meeting with vendors, supervising staff and hiring employees were essential functions (*id.* ¶¶ 19-21, 27, 31), all duties that obviously required a physical presence at Fort McCoy. *Cf. Whitaker*, 849 F.3d at 685 (explaining that plaintiff's "position required regular attendance" because her "responsibilities included answering phone calls, attending in-person meetings with clients, using the Department's internal computer system, and other tasks that required attendance").

Third, plaintiff could not have fulfilled any of these duties because he had no way to get to -- or even near -- the installation. Not only has he been living in Des Plaines, Illinois (approximately 200 miles from Fort McCoy), since his first stroke through at least the end of 2011, he was unable to drive. While plaintiff has suggested that he could have used Amtrak and a taxi to commute to the installation, this would have entailed a minimum one-way trek of nearly four hours. *See* Amtrak Schedule for Glenview, IL to Tomah, WI, Amtrak.com (follow "Schedules" hyperlink; then search starting point field for "Glenview, IL" and search destination field for "Tomah, WI"). Likewise, since he was

receiving ongoing treatment in Illinois, relocation would be impracticable. Even if commuting or relocation *might* have been possible, it was plaintiff's burden to put forth evidence in support of such a finding, not to merely offer speculation at summary judgment. *See Stern*, 788 F.3d at 289 ("speculative, untested suggestions" are insufficient to create a genuine issue of fact as to whether plaintiff could perform his essential job functions with accommodations); *id.* at 292 (explaining it is the *employee's* burden to show that he could have performed his essential job functions with a reasonable accommodation).

Fourth, an employer does not need to reassign essential functions to make an individual otherwise qualified. *See Ozlowski*, 237 F.3d at 841 (7th Cir. 2001) ("an employer may redistribute marginal functions of a job to other employees, [but] an employer is not required to reallocate essential functions"). Even assuming that plaintiff could have performed the other essential functions of his job from "nearby," plaintiff never sought or received permission to telework from his prior home in Warrens, Wisconsin. (*See* Clemens Dep. (dkt. #56) 127:25-128:12.)

Fifth, in November 2011, plaintiff acknowledged that he was productive for about two or three hours a day, requiring periods of rest after each activity. He also acknowledged having a short attention span, trouble keeping his train of thought, and confusion when multiple people speak at once. In fact, he told the Social Security Administration that he suffered from a "lack of stamina caused by doing anything." (*See id.* at 138:19-140:1.) While a reduced work schedule may be an appropriate accommodation in some instances, such severe limitations on plaintiff's ability to work show that he would not be able to

complete all the essential functions of the full-time supervisory public safety dispatcher position, even if he could telework, especially since even the supervisory position would by design appear to require unpredictable and even urgent demands.

Finally, neither form of accommodation that plaintiff postulates would change this analysis. While plaintiff repeatedly points to the "possibility" of using some form of text-to-speech program, as addressed above, difficulty speaking is not the only limitation preventing him from fulfilling the essential functions of the supervisory public safety dispatcher. Accordingly, even with the possibility of text-to-speech, he simply has not met his burden of showing that he could have performed the position's essential functions to the satisfaction of any reasonable jury.

Alternatively, plaintiff argues he should have been offered reassignment to a different position. While the Seventh Circuit has held that "the ADA does indeed mandate that an employer appoint employees with disabilities to vacant positions for which they are qualified, provided that such accommodations would be ordinarily reasonable and would not present an undue hardship to that employer," *EEOC v. United Airlines, Inc.*, 693 F.3d 760, 761 (7th Cir. 2012),[13]  the plaintiff has not established the requirements of those jobs, much less that he was qualified and capable of meeting those requirements

---

[13] Other courts have disagreed with the Seventh Circuit's reasoning in *United Airlines*. *See EEOC v. St. Joseph's Hosp., Inc.*, 842 F.3d 1333, 1346-47 (11th Cir. 2016) (holding that the trial court "did not err by failing to instruct the jury that the ADA requires reassignment without competition" and "uphold[ing] the district court's ruling that the ADA does not automatically mandate reassignment without competition"); *United States v. Woody*, 220 F. Supp. 3d 682, 692-94 (E.D. Va. 2016) ("Consistent with the Supreme Court's guidance in *Barnett*, the Court holds here that the ADA does not require minimally qualified disabled employees to be granted special preferences in hiring over non-disabled applicants."), *appeal docketed*.

(Def.'s Resp. to Pl.'s PFOF (dkt. #67) ¶¶ 111-12). *See Ozlowski*, 237 F.3d at 840 (plaintiff bears the burden of establishing that there was a vacant position for which he was qualified). Moreover, plaintiff never informed anyone at Fort McCoy that he could return to work in any capacity until filing suit. (*See* Pl.'s Resp. to Def.'s PFOF (dkt. #62) ¶ 154.) Further, he has not worked -- or even sought employment -- since his termination, and he admits that he cannot work due to his aphasia and associated communication problems. (*Id.* ¶¶ 195, 199.) Likewise, he has never been cleared by his doctors to return to work. (*Id.* ¶ 153.) Therefore, on the current record, a reasonable jury would have to find that plaintiff has not proven that reassignment was a viable option.

## ORDER

IT IS ORDERED that:

1) Defendant's motion for summary judgment (dkt. #50) is GRANTED AS UNOPPOSED as to plaintiff's retaliation claim and GRANTED as to plaintiff's discrimination claim.

2) The parties' joint motion to stay deadlines (dkt. #71) is DENIED AS MOOT.

3) The clerk of court shall enter judgment for defendant and close the case.

Entered this 6th day of August, 2018.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge